CAREY & SKINNER, INC. v. UNITED STATES

**No. 5896.**—Invoice dated Fort Erie, N. Ont., April 29, 1940.
Entered at Peace Bridge, Buffalo, N. Y., April 29, 1940.
Entry No. 5805.

(Decided June 25, 1943)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett, Richard E. Fitz-Gibbon,* and *Samuel D. Spector,* special attorneys), for the defendant.

KEEFE, Judge: This is an appeal for a reappraisement of certain scrap silk cord imported from Canada. The shipment consisted of one carton which was entered at a nominal value of $5 for the entire contents. The merchandise was appraised at $10.35 Canadian per gross yards, net packed, upon the basis of the cost of production.

At the trial the evidence disclosed that the shipper of the silk cord, Irvin Air Chute, Ltd., is a subsidiary of the Irving Air Chute, Ltd., Inc., of Buffalo, the ultimate consignee herein; that as a result of a conversation between certain officials of the two companies relative to the disposition of scrap cord and a suggestion that it might be given to the Boy Scout Organization, the Canadian subsidiary sent over a carton two-thirds filled with short ends averaging from 6 to 12 feet in length but containing some pieces of 28 and 51 feet long; that this particular silk cord is manufactured solely for use as parts of parachutes, and is purchased in continuous lengths of 540, 680, 780, or 1,020 linear feet; that the shortest length used in parachutes is 30-inch pieces to attach the pilot chute to the parachute; that the shortest continuous cord purchased is 54 feet; and that in fitting the various cords to parachutes they are stretched and there are always scrap ends of various lengths left over. It further appears that neither the Canadian nor the American company had ever been able to find an outlet for these scrap ends and they were disposed of by either burning or throwing away as rubbish; that the silk cord here imported, upon receipt by the importer, was dumped upon the rubbish pile with similar scrap cord and disposed of as rubbish.

Various customs officials at Peace Bridge in Buffalo testified that the carton of cord was taken from the truck, weighed and found to contain a hundred pounds net, the weight of the carton being esti-

mated; that samples were taken at random from various parts of the carton; that the weight of one linear yard was determined and from such weight, as reported, the collector would be able to estimate the number of yards in the shipment; that it was found that there were 7,202.72 linear yards; that to the knowledge of the customs officials there had never been a previous importation of such material and there was no foreign, export, or United States value for such cord; that an investigation was caused to be taken of the Canadian market and it was found that the shortest lengths sold were 57 linear feet; that the usual lengths in which such cord was manufactured and sold were from 540 to 1,020 feet, and that the cost of production of cord in the foregoing lengths was, packed, ready for shipment $9.84 per gross yards; that the selling price of such cord by the only manufacturer in Canada, the Belding-Corticelli, Ltd. of Montreal was $11.35 per gross yards, and the difference between that price and $9.84 represented the gross profit, including selling and certain administrative expenses. A breakdown of the expenses and profit in order to obtain the actual net profit was not obtainable. It further appears that the manufacturer of such cord sells to the exporter herein skeins of 680 linear feet; that scrap ends are never sold by the manufacturer and such ends are destroyed by burning; that certain random lengths which were shorter than 680 linear feet were sold to the shipper at a price of $10.35 per gross yards, but the shipment was unsatisfactory and only one lot was so sold; that in the year 1941 the Switlik Canadian Parachute Co., Ltd., had purchased random lengths or "seconds" at a price of about $9 per gross yards. An affidavit of the manager of the braid and tape department of Belding-Corticelli, Ltd., admitted in evidence, disclosed that during the year 1940 a quantity of about 70 gross yards in shorter lengths than 680 or 780 feet was sold to the exporter herein, presumably in lengths of 54 or 57 feet; and that it was impossible to determine the cost of production of parachute cord in pieces shorter than 54 or 57 feet in length. An affidavit of the Switlik Canadian Parachute Co., Ltd., disclosed that such firm had always purchased from the manufacturer such cord in lengths of 540 to 1,020 feet; that invariably there was up to 10 feet overage, about 1 per centum of which was usable for pilot chute attachments, and the remainder was discarded.

From the evidence before us it appears that the appraiser had adopted the price of $10.35 Canadian as the cost of production of the cord in question. The actual production costs amounted only to $9.84 not including the profit of the manufacturer, which was not obtainable; that a selling price of $11.35 per gross yards included the profit, as well as other expenses, and that lengths of 54 or 57 feet or "seconds" were sold at a reduction of $1 Canadian per gross yards, or $10.35 per gross yards. Therefore the appraiser in adopting the price

of $10.35 per gross yards, the selling price of random lengths, included the difference between the selling price and the production costs as profit. We fail to find any evidence before us establishing that such profit was greater than the profit allowable under section 402 (f) (4).

It is true that the imported material, according to the uncontradicted evidence, was worthless and had no commercial value, and was discarded upon importation. However, it has long been held that all imported merchandise for customs purposes must have some value. The basis of such value of imported merchandise, under section 402, act of 1930, shall be the foreign value, or the export value, whichever is higher. In the absence of either of such values the United States value is to be taken, but when there is no such value, the basis of appraisement shall be the cost of production. It is indeed unfortunate that the shippers of the merchandise herein or the importers failed to ascertain the perils awaiting the introduction into this country of valueless merchandise. Under the law, however, no relief may be granted by this reappraisement court.

There is some testimony attempting to establish that the quantity imported was actually less than 100 pounds as reported by the customs officials. That, however, is not a reappraisement matter, but it might be noted in passing that the quantity imported was not weighed by the importer or his representatives, and was destroyed without ascertaining the quantity imported. Evidence establishing that the merchandise could not possibly have weighed as much as reported by the weigher falls far short of establishing the actual weight.

For the reasons stated, I find nothing to disturb the action of the appraiser, which is presumptively correct, and I am constrained to adopt such value as the value to be used as the basis of duty.

Judgment will be rendered accordingly.